## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MATT MELLEN,

                Plaintiff,

v.

JASON B. DALTON; RASIER, LLC; and
UBER TECHNOLOGIES, INC.,

                Defendants.

Case No. 21-cv-784

Hon. Hala Y. Jarbou

Mag. Judge Ray S. Kent

**ORAL ARGUMENT REQUESTED**

| | |
|---|---|
| Matthew R. Cooper (P43072)<br>COOPER LAW, PLC<br>134 South Phelps St.<br>P.O. Box 64<br>Decatur, MI 49045<br>(269) 436-8316<br>matt@vadlawcenter.com | Thomas W. Cranmer (P25252)<br>Matthew P. Allen (P57914)<br>James L. Woolard (P77493)<br>MILLER, CANFIELD, PADDOCK AND<br>STONE, P.L.C.<br>840 W. Long Lake Rd., Ste. 150<br>Troy, Michigan  48098<br>(248) 879-2000 |
| Frank B. Melchiore (P41238)<br>LAWFM<br>535 Central Ave., Ste. 306<br>St. Petersburg, FL 33701<br>(727) 822-5900<br>lawfm1@gmail.com | cranmer@millercanfield.com<br>allen@millercanfield.com<br>woolard@millercanfield.com<br><br>*Attorneys for Defendants Uber Technologies,*<br>*Inc. and Rasier, LLC* |
| *Attorneys for Plaintiff* | |

## UBER TECHNOLOGIES, INC.'S AND RASIER, LLC'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS UNDER 9 U.S.C. §§ 3-4

    Defendants Uber Technologies, Inc. and Rasier, LLC move to compel arbitration of

Plaintiff Matt Mellen's claims and to stay these proceedings under 9 U.S.C. §§ 3-4.[1] In support of

their motion, Uber and Rasier refer to the attached brief, which is incorporated here by reference.

Pursuant to LCivR 7.1(d), Uber's counsel contacted plaintiff's counsel on December 2, 2021 and

---

[1] The Court dismissed Dalton as a defendant on October 6, 2021. PageID.220.

requested but did not obtain concurrence in the relief sought.

Respectfully submitted,

Dated: December 2, 2021

/s/ Matthew P. Allen
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
James L. Woolard (P77493)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
840 W. Long Lake Rd., Ste. 150
Troy, Michigan  48098
(248) 879-2000
cranmer@millercanfield.com
allen@millercanfield.com
woolard@millercanfield.com

*Attorneys for Defendants Uber Technologies,
Inc. and Rasier, LLC*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MATT MELLEN,

            Plaintiff,

v.

JASON B. DALTON; RASIER, LLC; and
UBER TECHNOLOGIES, INC.,

            Defendants.

Case No. 21-cv-784

Hon. Hala Y. Jarbou

Mag. Judge Ray S. Kent

**ORAL ARGUMENT REQUESTED**

---

Matthew R. Cooper (P43072)
COOPER LAW, PLC
134 South Phelps St.
P.O. Box 64
Decatur, MI 49045
(269) 436-8316
matt@vadlawcenter.com

Frank B. Melchiore (P41238)
LAWFM
535 Central Ave., Ste. 306
St. Petersburg, FL 33701
(727) 822-5900
lawfm1@gmail.com

*Attorneys for Plaintiff*

Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
James L. Woolard (P77493)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
840 W. Long Lake Rd., Ste. 150
Troy, Michigan  48098
(248) 879-2000
cranmer@millercanfield.com
allen@millercanfield.com
woolard@millercanfield.com

*Attorneys for Defendants Uber Technologies,
Inc. and Rasier, LLC*

---

## BRIEF SUPPORTING UBER TECHNOLOGIES, INC.'S AND RASIER, LLC'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS UNDER 9 U.S.C. §§ 3-4

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................................ iv

Introduction ......................................................................................................................1

Factual and Procedural Background ................................................................................1

   I.   Mellen voluntarily registered for Uber's services and agreed to Uber's Terms of
      Service, including a mandatory arbitration provision ..........................................2

   II.   Mellen continued using Uber's services after receiving notice of the updated
      Terms of Service .................................................................................................3

   III.  Mellen ignored the arbitration agreement and filed this lawsuit .........................4

   IV.  Procedural background ........................................................................................4

Argument .........................................................................................................................5

   I.   Applicable legal standards ...................................................................................5

       A.   The Federal Arbitration Act governs the parties' arbitration agreement ...................5

       B.   The Rule 56 summary judgment standard applies to this motion ..............................7

   II.  The Court must compel arbitration of Mellen's claims ..........................................7

       A.   Mellen agreed to arbitrate .....................................................................................8

           1.   Mellen agreed to arbitrate when he registered to use Uber's services...............9

           2.   Mellen again agreed to arbitrate when Uber emailed him notice of its
              revised Terms and Conditions and Mellen continued to use Uber's app
              thereafter .........................................................................................................13

           3.   *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018) is inapposite........16

       B.   The arbitration agreement clearly and unmistakably delegates the issues of its
          validity and scope to the arbitrator..........................................................................18

       C.   Mellen's claims fall within the scope of the arbitration agreement and the
          arbitration agreement is valid in any event ..............................................................20

1.   The arbitration agreement's plain language covers Mellen's claims.................21

2.   The arbitration agreement does not expressly exclude Mellen's claims from its broad scope........................................................................................23

3.   The arbitration agreement is valid and Mellen cannot allege or show otherwise......................................................................................................24

III.   The Court must stay this action until arbitration is completed .........................26

Conclusion ..........................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265 (1995) ......................................5

*Anderson v. Charter Commc'ns, Inc.*, 860 F. App'x 374 (6th Cir. 2021) ....................................26

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) ...............................21, 24

*Bank of Am., N.A. v. First American Title Ins. Co.*, 499 Mich. 74; 878 N.W.2d 816
(Mich. 2016) ...............................................................................................................................9

*Blanton v. Domino's Pizza Franchising, LLC*, 962 F.3d 842 (6th Cir. 2020) .................18, 19, 20

*Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832 (6th Cir. 2021) ...........................5, 7

*Brown ex rel. Henny Penny Corp. Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*,
No. 17-250, 2018 WL 3546186 (S.D. Ohio July 24, 2018) ......................................................16

*Cain v. Redbox Automated Retail, LLC*, 136 F. Supp. 3d 824 (E.D. Mich. 2015) .................11, 12

*Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577 (6th Cir. 2021) .................................................19, 20

*Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138; 706 N.W.2d 471 (2005) ...................25, 26

*Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985 (N.D. Cal. 2017) ...........................................12

*Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541 (W.D. Tex. 2017) ...........................................12

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018)...........................................16, 17, 18

*Dawson v. Rent-A-Ctr, Inc.*, 490 F. App'x 727 (6th Cir. 2012) ..............................................14, 15

*Del E. Webb Constr. v. Richardson Hosp. Auth.*, 823 F.2d 145 (5th Cir. 1987) ...........................6

*Detroit Tigers, Inc. v. Ignite Sports Media, LLC*, 203 F. Supp. 2d 789 (E.D. Mich. 2002) ...........8

*Deverze v. Uber Techs.*, Inc., No. 19-4988, 2020 WL 10111001 (N.D. Ga. May 7, 2020) ...........6

*E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002)..................................................................21

*Ehresman v. Bultynck & Co.*, 203 Mich. App. 350; 511 N.W.2d 724 (1994) ................................9

iv

*Fish v. Home Depot USA, Inc.*, 455 F. App'x 575 (6th Cir. 2012)................................................10

*Great Earth Cos., Inc. v. Simons*, 288 F.3d 878 (6th Cir. 2002) ......................................................7

*Hall v. Small*, 267 Mich. App. 330; 705 N.W.2d 741 (2005)..........................................................9

*Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248 (10th Cir. 2012) .........................................14

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, __ U.S. __, 139 S. Ct. 524 (2019) ......18, 19, 20

*Huffman v. Hilltop Companies, LLC*, 747 F.3d 391 (6th Cir. 2014) .......................................22, 24

*Ingram v. Neutron Holdings, Inc.*, 467 F. Supp. 3d 575 (M.D. Tenn. 2020) .................................8

*In re Auto. Parts Antitrust Litig.*, 951 F.3d 377 (6th Cir. 2020).....................................................8

*In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016) .............13, 15

*In re Uber Techs., Inc.*, No. 18-3169, 2019 WL 6317770 (C.D. Cal. Aug. 19, 2019) ......13, 15, 17

*Javitch v. First Union Secs., Inc.*, 315 F.3d 619 (6th Cir. 2003) .................................................5, 7

*Kensu v. JPay, Inc.*, 2018 WL 8368855, at *3 (E.D. Mich. Oct. 22, 2018),
    *adopted*, 2019 WL 1109948 (E.D. Mich. Mar. 11, 2019) ........................................................9

*Kettles v. Rent-Way, Inc.*, No. 09-230, 2009 WL 1406670 (W.D. Mich. May 18, 2009) .......14, 15

*Lamps Plus, Inc. v. Varela*, __ U.S. __, 139 S. Ct. 1407 (2019) ...................................................21

*Manville & Schell, P.C. v. Stricker*, No. 19-281, 2020 WL 7049356, at *3 (W.D. Mich.
    Aug. 21, 2020), *adopted in part*, 2020 WL 6375397 (W.D. Mich. Oct. 30, 2020)...................6

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017).......................................10, 11, 12, 16, 17

*Nestle Waters North America, Inc. v. Bollman*, 505 F.3d 498 (6th Cir. 2007)......................22, 24

*NILAC Int'l Marketing Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354 (6th Cir. 2004) ...................8

*Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279 (9th Cir. 2017).......................9

*Ozormoor v. TMobile USA, Inc.,* 354 F. App'x 972 (6th Cir. 2009)............................................26

*Parsley v. Monaco Coach Corp.*, 327 F. Supp. 2d 797 (W.D.Mich.2004)...................................10

*Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580 (N.D. Cal. 2020)..................................................10

*Pincaro v. Glassdoor, Inc.*, No. 16-6870, 2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017) ............13

*Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217 (2012) ............25

*Rex v. CSA-Credit Sols. of Am., Inc.*, 507 F. Supp. 2d 788 (W.D. Mich. 2007) .......................7, 21

*Rowan v. Brookdale Senior Living Communities, Inc.*, No. 13-1261, 2015 WL 9906264
   (W.D. Mich. June 1, 2015), *aff'd*, 647 F. App'x 607 (6th Cir. 2016) .........................................7

*Sacchi v. Verizon Online LLC*, No. 14-423, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015) ............13

*Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741 (Cal. 2015) ................................................25

*Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967 (6th Cir. 2007) ....................................8, 14

*Simon v. Pfizer Inc.*, 398 F.3d 765 (6th Cir. 2005) .......................................................................24

*Tillman v. Macy's, Inc.*, 735 F.3d 453 (6th Cir. 2013) ..................................................................14

*United States v. MacEwan*, 445 F.3d 237 (3d Cir. 2006) .................................................................6

*United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960) ...................24

*Walker v. Neutron Holdings, Inc.*, No. 19-574, 2020 WL 703268 (W.D. Tex.
   Feb. 11, 2020), *adopted*, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020) ................................12

*Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646 (6th Cir. 2008) ...................................5

*West v. Uber Techs.*, No. 18-3001, 2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ............12, 13, 16

*Zawada v. Uber Techs., Inc.*, No. 16-11334, 2016 WL 7439198 (E.D. Mich. Dec. 27, 2016),
   *aff'd*, 727 F. App'x 839 (6th Cir. 2018) ..................................................................20, 25, 26

**Statutes and Court Rules**

9 U.S.C. § 1 ...........................................................................................................................5, 6, 7

9 U.S.C. § 2 .................................................................................................................................5

9 U.S.C. § 3 ...............................................................................................................................26

M.C.L. § 440.1201(j) .....................................................................................................10, 11, 18

## INTRODUCTION

Over six years ago, Plaintiff Matt Mellen registered online for Defendant Uber Technologies, Inc.'s smartphone application ("Uber App."). As part of the registration process, Mellen agreed to Uber's Terms and Conditions, including a provision requiring Mellen to arbitrate his disputes with Uber and Defendant Rasier, LLC. Mellen later agreed to Uber's updated Terms, which again included a mandatory arbitration provision. Both arbitration agreements expressly incorporate the rules of the American Arbitration Association ("AAA").

Mellen now claims to have been harmed by his reliance on Uber's alleged representations in its App and on its website regarding the safety of rides provided by third-party drivers. Specifically, Mellen alleges harm "stemming from his alleged experience as a passenger in a vehicle driven recklessly by [Jason] Dalton, whom Mellen hired using Uber's software on February 20, 2016." PageID.216. Apart from the fact that Mellen's claims lack merit—which is not the issue before the Court—by bringing this action, Mellen has violated the mandatory arbitration provision to which he agreed when he registered for Uber's services, when he continued to use Uber's services after receiving notice of Uber's updated Terms, and every time he used the Uber App. Because Mellen agreed to arbitrate and the agreement incorporates the AAA Rules, the Court must compel arbitration, refer all remaining arbitrability issues to the arbitrator, and stay the case until the completion of arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

Uber Technologies, Inc. is a technology company that uses its proprietary technology to develop and maintain digital multi-sided platforms that provide users with various services, including matching and payment processing. Ex. 1, ¶ 4. One of the best known and most widely used of these platforms is the Rides platform, which facilitates the connection of individuals in

1

need of a ride with those willing to provide transportation services. *Id.* ¶ 5. Riders and drivers gain access to the Rides platform by completing the necessary steps to download and gain access to the respective rider and driver versions of the Uber App. *Id.* Uber licenses the driver app to Rasier, LLC, which has the option to sublicense the driver app to authorized independent drivers. *Id.* ¶ 6.

I.   <u>**Mellen voluntarily registered for the Uber's services and agreed to Uber's Terms of Service, including a mandatory arbitration provision.**</u>

Mellen registered for Uber via the Rider App on April 19, 2015. Ex. 1, ¶ 9; Ex. A to Ex.1. In order to register, Mellen had to complete the registration process. Ex 2, ¶¶ 4, 5. During that process, Mellen had to download the Rider App and click "Register." *Id.* ¶ 4(a). He then was prompted on a screen titled "Create an Account" to enter an email address, mobile number, and a password, or to connect with Facebook, and then, on the next screen (titled "Create a Profile") to enter his first and last name. *Id.* ¶ 4(b). On the next screen, titled "Link Payment," he was prompted to enter payment information. *Id.* ¶ 4(c). During this process, the following notice was visibly displayed in white and grey font that contrasts with a black background: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy." *Id.* & Ex. I. The phrase "Terms & Conditions and Privacy Policy" appears on a rectangular button outlined in grey; when clicked, the button would have displayed the Terms & Conditions and Privacy Policy then in effect ("Uber's Terms"). Ex. 2 ¶ 4(c); Ex. I to Ex. 2. The notice and link to the Terms & Conditions and Privacy Policy were visible to Mellen throughout the entire process of inserting payment information, either at the bottom of or in the middle of the screen. *See* Ex. 2 ¶ 4(c); Ex. I to Ex. 2. Uber's Terms were thus conspicuous and Mellen could not have registered for an account without assenting to them.

Uber's Terms included a mandatory arbitration provision pursuant to which Mellen agreed that "any dispute, claim or controversy arising out of or relating to these Terms or the breach,

termination, enforcement, interpretation or validity thereof or the use of the Services…will be settled by binding arbitration between you and Uber." Ex. B to Ex. 1, § 6. "Uber" is defined to include Uber's subsidiaries and affiliates, and "Services" are defined as "applications, websites, content, products, and services." *Id.* § 1. The arbitration agreement further provides that "[t]he arbitration will be administered by the American Arbitration Association ('*AAA*') in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the '*AAA Rules*') then in effect, except as modified by this "Dispute Resolution" section. *Id.* § 6 (emphasis in original).

## II.     Mellen continued using Uber's services after receiving notice of the updated Terms of Service.

On November 16, 2016, Uber emailed Mellen to inform him that Uber had updated its Terms. Ex. 1 ¶ 11; Exs. C & D to Ex. 1. The email subject was "We've Updated Our Terms of Use" and the email specifically noted that the updates included a "revised arbitration agreement which explains how legal disputes are handled." Ex. 1 ¶ 11; Ex. D to Ex. 1. The email also instructed Mellen to "make sure to read [Uber's Terms] fully" and provided a blue-colored hyperlink to the Terms, explaining "you can access [the Terms] here." Ex. D to Ex. 1. And the email expressly alerted Mellen that "[i]f you use our app or other services on or after [November 21, 2016], you're confirming you've read and agree to the updated Terms." Ex. 1 ¶ 12; Ex. D to Ex. 1. The arbitration agreement appeared in bold, capitalized print in the first section of the first page of the updated Terms:

> **IMPORTANT: PLEASE REVIEW THE ARBITRATION AGREEMENT SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS THROUGH FINAL ARBITRATION. BY ENTERING THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND**

**HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.**

Ex. E to Ex. 1; *see* Ex. 1 ¶ 13. On November 27, 2016, eleven days after Uber sent the email to Mellen and six days after Uber's updated Terms took effect, Mellen used the Uber App to request a ride. Ex. F to Ex. 1; *see* Ex. 1 ¶ 14. Mellen then continued to use the Uber App a total of 114 more times over the next approximately 15 months, Ex. F to Ex. 1, and thereby assented to the arbitration agreement in the updated Terms each time.

### III.    Mellen ignored the arbitration agreement and filed this lawsuit.

Despite agreeing to arbitrate both at registration and by continuing to use the Uber App after receiving notice of Uber's updated Terms, Mellen filed this action in Kalamazoo County, Michigan Circuit Court, asserting claims for violation of the Michigan Consumer Protection Act, fraud, and silent fraud, all based on Uber's alleged representations or omissions on its App and website regarding rider safety. *See* PageID.11. All three claims fall within the scope of the arbitration agreement and therefore must be arbitrated.

### IV.    Procedural background

Mellen originally filed this action against Uber, Rasier, and Jason Dalton in Kalamazoo County, Michigan Circuit Court on February 18, 2021. *See* PageID.11. The state court entered a stipulated order on August 27, 2021, extending Uber and Rasier's time to respond to the complaint to December 2, 2021. PageID.46. Uber and Rasier timely removed the action to this Court on September 10, 2021, *see* PageID.1, and the Court dismissed Dalton and denied Mellen's request to remand the case to state court on October 6, 2021. PageID.216.

# ARGUMENT

## I.    Applicable legal standards

The Federal Arbitration Act ("FAA") and the standard governing motions for summary judgment under Fed. R. Civ. P. 56 apply to the Court's resolution of this motion.

### A.    The Federal Arbitration Act governs the parties' arbitration agreement.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "manifests 'a liberal federal policy favoring arbitration agreements.'" *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). To that end, the FAA provides that written arbitration agreements in contracts "evidencing a transaction involving [interstate] commerce…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see* 9 U.S.C. § 1 (defining "commerce" to include "commerce among the several States"). And "[t]o enforce this dictate [*viz.* of Section 2], the Federal Arbitration Act (FAA) provides for a stay of proceedings when an issue is referable to arbitration and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (citing 9 U.S.C. §§ 3 and 4); *accord Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 836-37 (6th Cir. 2021) (suggesting that a defendant in an existing suit may move to compel arbitration under either Section 3 or Section 4, but stating that a defendant can only obtain a stay by invoking Section 3).

The scope of the phrase "involving commerce" in 9 U.S.C. § 2 is "broad" and "cover[s] more than only persons or activities *within the flow* of interstate commerce." *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 273-74 (1995) (concluding that "involving" is "the functional equivalent of 'affecting'" under the Commerce Clause) (internal quotation marks

omitted). Transactions between parties in different states thus "involve commerce." *See id.* at 282 (finding "the transaction in this case, in fact, involved interstate commerce" based in part on "the multistate nature" of the plaintiff); *Del E. Webb Constr. v. Richardson Hosp. Auth.*, 823 F.2d 145, 147 (5th Cir. 1987) (finding that "[c]itizens of different states engaged in performance of contractual operations in one of those states are engaged in a contract involving commerce under the FAA"). The same is true of transactions conducted through the internet and cellular technologies. *See United States v. MacEwan*, 445 F.3d 237, 244, 245 (3d Cir. 2006) (stating that "the Internet is an instrumentality and channel of interstate commerce" and that "because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to user, the data has traveled in interstate commerce"); *Deverze v. Uber Techs.*, Inc., No. 19-4988, 2020 WL 10111001, at *2 (N.D. Ga. May 7, 2020) (finding that "transactions via the Uber app involve the internet, and the internet is an instrumentality of interstate commerce" (citing *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004))); *Manville & Schell, P.C. v. Stricker*, No. 19-281, 2020 WL 7049356, at *3 (W.D. Mich. Aug. 21, 2020), *adopted in part, rejected in part on other grounds*, 2020 WL 6375397 (W.D. Mich. Oct. 30, 2020) (Jarbou, J.) (finding transactions conducted using the internet involved interstate commerce for purposes of the Lanham Act).

Here, the arbitration provision is contained in Uber's Terms and Conditions, which involve services provided through the internet via Uber's app and its webpage. Ex B to Ex. 1, §§ 1 (defining the relevant services as including Uber's app and webpage), 6 (arbitration provision); Ex E to Ex. 1, §§ 2 (defining the relevant services as including Uber's mobile application), 3 (arbitration provision). Mellen alleges that he signed up for and used Uber's services through its app and that he chose to do business with Uber based on alleged representations on Uber's app and website.

PageID.13, 29; *see also* PageID.13 (alleging Uber and Rasier "are in the business of . . . a mobile phone application"). Moreover, the transaction in this case was between parties from different states. *See* PageID.12 (alleging that Mellen is a Michigan resident and Uber and Rasier are incorporated or headquartered in Delaware and California). The parties' arbitration agreement is thus in a contract "evidencing a transaction involving commerce" and is covered by the FAA. 9 U.S.C. §§ 1, 2.

**B.      The Rule 56 summary judgment standard applies to this motion.**

If, as here, the court considers evidence outside the complaint in resolving a motion to compel arbitration, then it applies the Rule 56 summary judgment standard. *Boykin*, 3 F.4th at 838; *Rowan v. Brookdale Senior Living Communities, Inc.*, No. 13-1261, 2015 WL 9906264, at *1 (W.D. Mich. June 1, 2015), *aff'd*, 647 F. App'x 607 (6th Cir. 2016). The party opposing arbitration "bears the burden of establishing that the dispute is nonarbitrable," *Rex v. CSA-Credit Sols. of Am., Inc.*, 507 F. Supp. 2d 788, 793 (W.D. Mich. 2007) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)), and "must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (further noting that "[t]he required showing mirrors that required to withstand summary judgment in a civil suit").

**II.      The Court must compel arbitration of Mellen's claims.**

"Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). The question of an arbitration agreement's <u>existence</u> (i.e., its formation) "is always a question to be resolved by

the court," while the questions of the arbitration agreement's <u>validity</u> (i.e., its enforceability) and <u>scope</u> may be delegated to the arbitrator. *Ingram v. Neutron Holdings, Inc.*, 467 F. Supp. 3d 575, 581 (M.D. Tenn. 2020); *accord In re Auto. Parts Antitrust Litig.*, 951 F.3d 377, 382-83 (6th Cir. 2020) (stating that "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue" (citation omitted)). Here, the Court must only resolve the first question— whether an arbitration agreement exists—because, as explained in Section B below, the parties delegated all remaining arbitrability questions (including validity and scope) to the arbitrator.

A. **Mellen agreed to arbitrate.**

Whether an arbitration agreement has been formed is determined by reference to the applicable state law of contract formation. *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007). Because the Court has jurisdiction based on the diversity of the parties, it applies Michigan's choice-of-law rules to determine the applicable state law of contract formation. *NILAC Int'l Marketing Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004). Under Michigan law, contractual choice-of-law provisions are generally enforceable. *Detroit Tigers, Inc. v. Ignite Sports Media, LLC*, 203 F. Supp. 2d 789, 793-94 (E.D. Mich. 2002) (citing *Johnson v. Ventra Group, Inc.,* 191 F.3d 732, 738 (6th Cir.1999)). Uber's Terms and Conditions contain a choice-of-law provision under which California law governs. Ex. B to Ex. 1, § 7; Ex. E to Ex. 1, § 7. However, courts have found that such provisions do not apply when the existence of the underlying contract is at issue, and absent such a provision, Michigan law applies "unless a rational reason for doing so otherwise exists." *Detroit Tigers*, 203 F. Supp. 2d at 793-94 (quoting *Sipes v. Kinetra, LLC,* 137 F. Supp. 2d 901, 906 (E.D. Mich.2001)). The result here is the same whether

Michigan or California law applies: Mellen agreed to arbitrate.

> 1.      Mellen agreed to arbitrate when he registered to use Uber's services.

For a valid contract to exist under Michigan law, there must be "(1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of Am., N.A. v. First American Title Ins. Co.*, 499 Mich. 74, 100; 878 N.W.2d 816 (Mich. 2016); *cf. Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (requiring elements 1-4 under California law). Mellen has not claimed to lack competency to contract, and there can be no dispute that Uber's services are a proper subject matter for contract or that Mellen received the benefit of using Uber's services. *See Bank of Am.*, 499 Mich. at 101 (noting that "[i]n order for consideration to exist, there must be a bargained-for exchange—"a benefit on one side, or a detriment suffered, or service done on the other"). Both Mellen and Uber are obligated to arbitrate disputes under the arbitration agreement, establishing mutuality of obligation. Ex. B to Ex. 1, § 6; Ex. E to Ex. 1, § 2.

Under Michigan law, mutuality of agreement—or mutual assent (*see Hall v. Small*, 267 Mich. App. 330, 333; 705 N.W.2d 741 (2005))—can be established by conduct, including by accepting delivery of an agreement and operating under its terms, *Ehresman v. Bultynck & Co.*, 203 Mich. App. 350, 354-55; 511 N.W.2d 724 (1994) (finding arbitration agreement existed based on receipt of agreement and operation under its terms), or by the use of online services. *See Kensu v. JPay, Inc.*, 2018 WL 8368855, at *3 (E.D. Mich. Oct. 22, 2018), *adopted*, 2019 WL 1109948 (E.D. Mich. Mar. 11, 2019) (citing *Carey v. Uber Techs., Inc.*, 2017 WL 1133936, at *4 (N.D. Ohio March 27, 2017) for the proposition that "clicking through screens to sign up to use a product, even where terms are contained in a hyperlink, is an acceptable method to manifest assent to the terms of an agreement even if the user failed to actually review the terms"). Courts in California

and elsewhere have found assent where a website or app "notif[ies] the user of the existence of the website's terms of use and…advise[s] the user that he or she is agreeing to the terms of service when registering or signing up," as long as "the existence of the terms was reasonably communicated to the user." *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 585-86 (N.D. Cal. 2020) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017)). Whether terms are reasonably communicated hinges on the conspicuousness of the hyperlink to those terms. *See Meyer*, 868 F.3d at 75.

Although it appears that few, if any, Michigan court decisions have addressed the conspicuousness of linked terms, Michigan courts have applied the UCC's definition of "conspicuous" in the context of printed contracts. *E.g.*, *Fish v. Home Depot USA, Inc.*, 455 F. App'x 575, 582–83 (6th Cir. 2012) (citing the UCC and stating that "whether a disclaimer can be considered conspicuous depends on whether a reasonable person ought to have noticed it"); *Parsley v. Monaco Coach Corp.*, 327 F. Supp. 2d 797, 800 (W.D.Mich.2004). Michigan's version of the UCC provides that "[c]onspicuous terms include…[l]anguage in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." M.C.L. § 440.1201(j).

During the process of registering for an Uber account, Mellen was presented several times with the following notice, which was visibly displayed in white and grey font that contrasted with the black background: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy." Ex. 2 ¶ 4; Ex. I to Ex. 2. The phrase "Terms & Conditions and Privacy Policy" appeared on a rectangular button outlined in grey; when clicked, the button would have displayed the Terms & Conditions and Privacy Policy then in effect. Ex. 2 ¶ 4; Ex. I to Ex. 2. The button was

10

even more recognizable as a clickable button by the fact that on at least two screens it was located directly above numbers that likewise appeared on grey rectangles and were clearly meant to be clicked in order to input payment information. *See* Ex. I to Ex. 2. The notice and link to the Terms & Conditions and Privacy Policy were visible to Mellen throughout the entire process of inserting payment information, either at the bottom or in the middle of the screen. Ex. 2 ¶ 4; Ex. I to Ex. 2.

As presented to Mellen during the registration process, Uber's Terms were conspicuous under M.C.L. § 440.1201(j)(ii), because the words "[b]y creating an Uber account, you agree to the Terms & Conditions and Privacy Policy" and "Terms & Conditions and Privacy Policy" were "in contrasting color to surrounding text of the same size" (white and grey, respectively, in contrast both to the nearby same-sized text in black and blue, and to the black background), and the phrase "Terms & Conditions and Privacy Policy" was furthermore "set off from surrounding text of the same size by symbols or marks"—namely, by a rectangular grey outline. The existence of Uber's Terms were therefore "reasonably communicated" (*Meyer*, 868 F.3d at 75) to Mellen as a matter of Michigan law, and Mellen assented to them by registering for an Uber account.

Despite the dearth of Michigan case law addressing assent to online terms, at least one Michigan federal court has found assent to terms of use presented on a screen where those terms were even <u>less</u> conspicuous than the terms in this case. In *Cain v. Redbox Automated Retail, LLC*, 136 F. Supp. 3d 824, 833 (E.D. Mich. 2015), the plaintiffs were presented with a screen where the following statement appeared: "By pressing 'pay' or 'use credits' you agree to the Terms." Like here, the phrase appeared in white font against a dark background, and the terms themselves were made accessible by a clickable button outlined in grey on which the words "Terms & Privacy" appeared. *See* E.D. Mich. Case No. 12-15014, ECF No.48-8 (attached as Exhibit 3.) But unlike here, the notice of agreement and the button were separated from each other, they were written in

11

smaller font than the surrounding text, were located at the bottom of the screen, and the screen was cluttered with at least five buttons, additional terms, and an image from the movie being rented. *See id.* The court nonetheless held that the plaintiffs "clearly assented to the Terms of Use." *Cain*, 136 F. Supp. 3d at 833.

Finally, courts in California and elsewhere have found the same or similar presentation of linked terms to be conspicuous and to therefore support a finding of assent to those terms. In *West v. Uber Techs.*, No. 18-3001, 2018 WL 5848903, at *4 (C.D. Cal. Sept. 5, 2018), the court held that the nearly identical presentation of Uber's Terms—"a gray, rectangular box with a black background that contained the phrase 'Terms of Service & Privacy Policy'"—was sufficiently conspicuous to support a finding that the plaintiff had assented to Uber's Terms, including the arbitration provision. The court noted that "[c]lickable buttons come in all shapes and sizes, and courts properly apply a 'reasonably prudent smartphone user' to the analysis." *Id.* (citing *Meyer*, 868 F.3d at 79). And in *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017), the court likewise found the plaintiff had assented to Uber's terms, including the arbitration provision, where the terms were similarly presented via a "clickable box" containing the phrase "Terms & Conditions and Privacy Policy." *See also Walker v. Neutron Holdings, Inc.*, No. 19-574, 2020 WL 703268, at *3-4 (W.D. Tex. Feb. 11, 2020), *adopted*, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020); *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 548 (W.D. Tex. 2017).

Under Michigan and California law, then, Uber's Terms, including the mandatory arbitration provision, were reasonably communicated to Mellen when he registered to use Uber's services, and he assented to the terms by then using Uber's services. Mellen accordingly agreed to arbitrate when he registered to use Uber's services.

2.      Mellen again agreed to arbitrate when Uber emailed him notice of its revised Terms and Conditions and Mellen continued to use Uber's app thereafter.

Mellen also separately and independently agreed to arbitrate when he continued to use the Uber App after Uber sent him an email on November 16, 2016 giving notice of its updated terms, which again included an arbitration provision.

Courts around the U.S. have held that consumers assent to updated terms of service, including mandatory arbitration clauses, when they continue to use services after being emailed notice that the terms have been updated and that continued use of the services constitutes assent. Indeed, courts have found agreements to arbitrate based on the very same email that Uber sent to Mellen on November 16, 2016. In *In re Uber Techs., Inc.*, No. 18-3169, 2019 WL 6317770, at \*4 (C.D. Cal. Aug. 19, 2019), the court held that the plaintiff "was bound by the updated Rider Terms that Uber sent to [her] via email in November 2016." The court found that the email "expressly stated that Uber revised the arbitration agreement and that continued use of the Uber App would serve as consent to the updated terms" and that the plaintiff had, in fact, continued to use the Uber App after receiving the email. *Id.* The court concluded that "even if [the plaintiff's] initial registration process were somehow flawed, she was still on notice of the updated terms" and "was bound by" them. *Id.*; *accord West v. Uber Techs., Inc.*, No. 18-3001, 2018 WL 5848903, at \*5 (C.D. Cal. Sept. 5, 2018) (finding plaintiff agreed to arbitrate based on same Uber email and continued use of the Uber App). Courts have likewise held that plaintiffs agreed to arbitrate based on other similar emails. *E.g.*, *Pincaro v. Glassdoor, Inc.*, No. 16-6870, 2017 WL 4046317, at \*6 (S.D.N.Y. Sept. 12, 2017); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2016); *Sacchi v. Verizon Online LLC*, No. 14-423, 2015 WL 765940, at \*3 (S.D.N.Y. Feb. 23, 2015); *see Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1258-59 (10th

13

Cir. 2012).

Although courts applying Michigan law do not appear to have addressed these exact circumstances, they have addressed the analogous circumstances of agreements to arbitrate based on continued employment after notice of updated employment terms that include arbitration provisions. In that context, Michigan courts have consistently held that plaintiffs agreed to arbitrate where they were sent notice of updated terms and were advised that continued employment constituted assent to those terms, and then continued their employment. For example, in *Dawson v. Rent-A-Ctr, Inc.*, 490 F. App'x 727, 728-30 (6th Cir. 2012), the Sixth Circuit held that the plaintiff had assented to an arbitration agreement when the defendant had mailed notice of a new arbitration agreement to the plaintiff's house, the agreement stated that continued employment would indicate assent to arbitration, and the plaintiff "demonstrated his assent by continuing to work for" the defendant. Other courts have held likewise. *E.g.*, *Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013) (finding assent to arbitrate where employee watched an informational video and was mailed notice of the arbitration agreement, and continued employment); *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972-73 (6th Cir. 2007) (applying Tennessee law and holding that the plaintiff had agreed to arbitrate when the defendant had mailed notice of an arbitration agreement to the plaintiff, the notice expressly stated that continued employment constituted assent to arbitration, and the plaintiff continued her employment); *Kettles v. Rent-Way, Inc.*, No. 09-230, 2009 WL 1406670, at *10 (W.D. Mich. May 18, 2009) (finding assent to arbitrate based on notice of arbitration program mailed to employee's home, where notice stated that continued employment constituted assent).

On November 16, 2016, Uber emailed Mellen to inform him that Uber had updated its Terms. Ex. 1 ¶ 11; Exs. C & D to Ex. 1. The email subject read "We've Updated Our Terms of

Use" and the email specifically noted that the updates included a "revised arbitration agreement which explains how legal disputes are handled." Ex. 1 ¶ 11; Ex. D to Ex. 1. The email explicitly instructed Mellen to "make sure to read [Uber's Terms] fully" and provided a blue-colored hyperlink to the Terms, explaining "you can access [the Terms] here." Ex. D to Ex. 1. And the email expressly alerted Mellen that "[i]f you use our app or other services on or after [November 21, 2016], you're confirming you've read and agree to the updated Terms." Ex. 1 ¶ 12; Ex. D to Ex. 1. The arbitration agreement appeared in bold, capitalized print in the first section of the first page of the updated Terms:

> **IMPORTANT: PLEASE REVIEW THE ARBITRATION AGREEMENT SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS THROUGH FINAL ARBITRATION. BY ENTERING THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.**

Ex. E to Ex. 1; *see* Ex. 1 ¶ 13. On November 27, 2016, eleven days after Uber sent the email to Mellen and six days after Uber's updated Terms took effect, Mellen used the Uber App to request a ride. Ex. F to Ex. 1; *see* Ex. 1 ¶ 14. Mellen then continued to use the Uber App a total of 114 more times over the next approximately 15 months. Ex. F to Ex. 1.  As in the cases cited above, (1) Uber's email expressly informed Mellen of the arbitration agreement's existence, (2) Uber's email expressly stated that Mellen's continued use of Uber's services would constitute assent to Uber's updated terms, including the arbitration agreement, and (3) Mellen continued to use Uber's services and thereby assented to the arbitration agreement. *In re Uber Techs., Inc.*, 2019 WL 6317770, at *4; *Facebook*, 185 F. Supp. 3d at 1166-67; *see Dawson*, 490 F. App'x at 728-30; *Kettles*, 2009 WL 1406670, at *10.

15

3.     *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018)  is inapposite.

Uber and Rasier expect that Mellen will cite *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018) to support his anticipated assertion that he was not "reasonably notified" of and did not assent to Uber's Terms, including the arbitration agreement. *Cullinane*, however, has not been cited favorably in the Sixth Circuit and has rarely been cited outside of the First Circuit at all. In fact, only one district court in the Sixth Circuit has cited *Cullinane*, and then only to note that it was "of little use." *Brown ex rel. Henny Penny Corp. Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, No. 17-250, 2018 WL 3546186, at *5 n.6 (S.D. Ohio July 24, 2018).  Courts in the Second and Ninth Circuits, which have significant experience with online customer agreements in general and with Uber's arbitration clauses in particular, have largely declined to follow the result in *Cullinane*. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77-80 (2d Cir. 2017) (pre-*Cullinane*, but finding Uber's terms of service reasonably conspicuous and noting that the issue should be analyzed from the "perspective of a reasonable smartphone user"). Indeed, the court in *West v. Uber Techs.*, 2018 WL 5848903, at *4 (C.D. Cal. Sept. 5, 2018), noted that "the *Cullinane* decision departs dramatically both from what other courts have found regarding Uber's registration process, and from the overall legal landscape regarding assent to online agreements."

The *Cullinane* court reviewed the screen images the plaintiffs saw while registering to use the Uber app in 2014. 893 F.3d at 62-64. The court decided that the hyperlink to Uber's terms and the notice that signup constituted acceptance of the terms were not conspicuous enough, and so the plaintiff was not reasonably notified of the terms (including the arbitration provision therein). *Id.* The court focused on the following features: (1) the link was "presented in a gray rectangular box in white bold text," rather than as "blue and underlined," (2) other terms on the screens were

also in bold font and some were larger than the link text, and (3) one screen featured a "large blue PayPal button in the middle," which the court found "more attention-grabbing." *Id.* at 63-64.

By contrast, the features Mellen encountered in the registration process reasonably notified him of Uber's Terms and the arbitration clause therein. First, as explained in Section II.A.1 above, the words "Terms & Conditions and Privacy Policy" appeared in a box outlined in grey, and "a reasonably prudent smartphone user would recognize that a box with text inside labeled "Terms of Service" is clickable and would lead to a display of those terms." *In re Uber Techs.*, 2019 WL 6317770, at *4 (citing *Meyer*, 868 F.3d at 77, 79); *Meyer*, 868 F.3d at 77 (explaining that "when considering the perspective of a reasonable smartphone user, we need not presume that the user has never before encountered an app or entered into a contract using a smartphone"). Even the *Cullinane* court itself admitted that hyperlinks do not need to be blue and underlined to be recognizable as hyperlinks. *Cullinane*, 893 F.3d at 63 (conceding that "not all hyperlinks need to have the same characteristics"). Second, other grey-outlined boxes on the screen—the numbered boxes immediately beneath the "Terms & Conditions" button—were plainly recognizable as clickable buttons used to input credit card and other information. Hence a reasonable smartphone user would also recognize the grey-outlined box containing the "Terms & Conditions" language as clickable. Third, the words "[b]y creating an Uber account, you agree to Terms & Conditions and Privacy Policy" appeared in the <u>middle</u> of multiple screens and was therefore "attention-grabbing" like the PayPal button in the middle of the screen in *Cullinane*. Fourth, where, as here, "notice of the Terms of Service is provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply," a "reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account." *Meyer*, 868 F.3d at 78. Fifth, the phrase "Terms & Conditions and Privacy Policy" is conspicuous as a matter

of Michigan law because it is both "in contrasting color to surrounding text of the same size" and

is "set off from surrounding text of the same size by…marks that call attention to the language."

M.C.L. § 440.1201(j)(ii). Finally, and most importantly, Mellen, unlike the Uber riders in

*Cullinane*, <u>also agreed to the November 2016 Terms and Conditions.</u>

In short, *Cullinane* is inapposite and does not change the fact that Mellen assented to Uber's

Terms, including mandatory arbitration, both when he registered to use the Uber App in April

2015 and when he continued to use the Uber App after receiving notice of Uber's updated Terms

in November 2016.

### B.  <u>The arbitration agreement clearly and unmistakably delegates the issues of its validity and scope to the arbitrator.</u>

Because the arbitration agreement specifies that disputes will be governed by the Rules of

the American Arbitration Association ("AAA"), the Court must leave the determination of the

validity of the arbitration agreement and whether Mellen's claims fall within the agreement's scope

to the arbitrator. In any event, the arbitration agreement is valid and its broad scope plainly

encompasses Mellen's claims.[2]

The questions of an arbitration agreement's validity (whether it is enforceable) and scope

(whether it covers a particular claim or controversy) are "gateway" questions of "arbitrability."

*Blanton v. Domino's Pizza Franchising, LLC*, 962 F.3d 842, 844 (6th Cir. 2020) (quoting *Henry*

*Schein, Inc. v. Archer & White Sales, Inc.*, __ U.S. __, 139 S. Ct. 524, 529 (2019)). It is well-

established that parties can agree to have the arbitrator resolve such gateway questions "so long as

the parties' agreement does so by clear and unmistakable evidence." *Henry Schein*, 139 S. Ct. at

530; *accord Blanton*, 962 F.3d at 844. And "if the agreement delegates the arbitrability issue to an

---

[2] As noted above, the Court dismissed Dalton from the case on October 6, 2021. PageID.220.
Hence the only remaining claims are Mellen's claims against Uber and Rasier.

arbitrator, a court may not decide the arbitrability issue." *Henry Schein*, 139 S. Ct. at 530; *accord Blanton*, 962 F.3d at 844 ("And when parties have agreed to arbitrate 'arbitrability,' a court may not disregard their agreement.").

Whether an arbitration agreement meets the "clear and unmistakable" standard is solely a question of federal law. *Blanton*, 962 F.3d at 846-47. The Sixth Circuit recently joined eleven of the twelve other U.S. Courts of Appeals in holding that "the incorporation of the AAA Rules (or similarly worded arbitral rules) provides clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Id.* at 846 (internal quotation marks omitted) (citing cases); *accord Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021). That is because the AAA Rules unambiguously give the arbitrator jurisdiction over the question of whether a given dispute falls within the scope of an existing arbitration clause: both AAA Commercial Arbitration Rule R-7(a) and AAA Consumer Arbitration Rule R-14(a) provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Ex. 3; *Ciccio*, 2 F.4th at 583 (quoting the same provision).

Here, the parties' arbitration agreement expressly provides that the AAA Rules will govern arbitration of this dispute. The Terms and Conditions to which Mellen agreed when he signed up to use Uber's app on April 19, 2015 provide that "[t]he arbitration will be administered by the American Arbitration Association ('*AAA*') in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the '*AAA Rules*') then in effect, except as modified by this "Dispute Resolution" section. Ex. B to Ex. 1, § 6 (emphasis in original). The updated Terms to which Mellen agreed in November 2016 likewise provide that "[t]he arbitration will be administered by the American Arbitration Association ('AAA') in

accordance with the AAA's Consumer Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the 'AAA Rules') then in effect." Ex. E to Ex. 1, § 2. By incorporating the AAA Rules, the parties' arbitration agreement thus clearly and unmistakably authorizes the arbitrator alone to decide the validity of the arbitration agreement and whether Mellen's claims are within the arbitration agreement's scope. *Blanton*, 962 F.3d at 846; *Ciccio*, 2 F.4th at 583. And if that somehow weren't enough, the arbitration agreement in the updated Terms also expressly provides that:

> the arbitrator ("Arbitrator"), and not any federal, state, or local court or agency, shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement, including any claim that all or any part of this Arbitration Agreement is void or voidable. The Arbitrator shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the Terms are unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel.

Ex. E to Ex. 1, § 2. This language is additional "clear and unmistakable" evidence that the parties delegated all arbitrability questions to the arbitrator. *See Zawada v. Uber Techs., Inc.*, No. 16-11334, 2016 WL 7439198, at *5 (E.D. Mich. Dec. 27, 2016), *aff'd*, 727 F. App'x 839 (6th Cir. 2018) (holding provision saying that "matters including the enforceability, revocability, or validity of the Arbitration Provision or any portion of the Arbitration Provision ... shall be decided by an Arbitrator and not by a court or judge" clearly and unmistakably delegated arbitrability issues to the arbitrator). And "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein*, 139 S. Ct. at 529.

    **C.**    <u>**Mellen's claims fall within the scope of the arbitration agreement and the arbitration agreement is valid in any event.**</u>

Even if the Court were to nonetheless conclude that it has jurisdiction to decide the questions of whether the parties' arbitration agreement is valid and whether Mellen's claims fall

within its scope, the answer to both questions is plainly yes. As an initial matter, the FAA "creates a general presumption of arbitrability," and as "[t]he party opposing an arbitration agreement," Mellen "bears the burden of establishing that the dispute is nonarbitrable." *Rex v. CSA-Credit Solutions of Am., Inc.*, 507 F. Supp. 2d 788, 793 (W.D. Mich. 2007) (quoting *Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 576-77 (6th Cir. 2003) and citing *Green Tree Fin. Corp.-Ala. V. Randolph*, 531 U.S. 79, 91 (2000)). In other words, <u>Mellen</u> must prove that the arbitration agreement is invalid and that his claims do not fall within its scope. He cannot meet that burden. The arbitration agreement's language is broad, plainly covers Mellen's use of Uber's "Services" (which are defined to include, among other things, Uber's app and website), and does not expressly exclude Mellen's claims. Moreover, Mellen has not challenged the validity of the arbitration agreement and numerous courts have found the same agreement to be valid.

1.     <u>The arbitration agreement's plain language covers Mellen's claims.</u>

"Absent some ambiguity in the agreement . . . it is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). And any such "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, __ U.S. __, 139 S. Ct. 1407, 1418 (2019); *accord AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (stating that "where the contract contains an arbitration clause, there is a presumption of arbitrability" and arbitration must be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute").

The plain language of the arbitration agreement Mellen entered when registering for the App provides that "any dispute, claim or controversy arising out of or relating to these Terms [*viz.* the Terms and Conditions] or the breach, termination, enforcement, interpretation or validity

thereof or the use of the Services (collectively, "*Disputes*") will be settled by binding arbitration between you and Uber." Ex. B to Ex. 1, § 6. "Uber" is defined to include Uber's subsidiaries and affiliates, and therefore the agreement covers Mellen's claims against both Uber and Rasier. "Services" are defined as "applications, websites, content, products, and services." *Id.* § 1. Likewise, the arbitration agreement in Uber's November 2016 revised terms, to which Mellen agreed by continuing to use Uber's services after receiving those revised terms, provides that:

> any dispute, claim or controversy arising out of or relating to (a) these Terms or the existence, breach, termination, enforcement, interpretation, or validity thereof, or (b) your access to or use of the Services at any time, whether before or after the date you agreed to the Terms, will be settled by binding arbitration between you and Uber, and not in a court of law.

Ex. E to Ex. 1, § 2. "Uber" is again defined to include Uber's subsidiaries and affiliates, *id.* § 1, and "Services" are defined as "compris[ing] mobile applications and related services." *Id.* § 3.

The Sixth Circuit has consistently characterized as "far-reaching" and "extremely broad" the scope of agreements that, like the arbitration agreements here, mandate arbitration of any dispute "arising out of or relating to" a contract or its breach. *Huffman v. Hilltop Companies, LLC*, 747 F.3d 391, 395 (6th Cir. 2014) (finding that scope of arbitration agreement covering "[a]ny Claim arising out of or relating to this Agreement, or the breach thereof" was "not only far-reaching but also very similar to other arbitration clauses that this court has described as broad" (internal quotation marks omitted)); *Nestle Waters North America, Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir. 2007) (finding that scope of arbitration agreement "govern[ing] any controversy arising out of" a contract was "extremely broad" (internal quotation marks omitted)). Mellen's claims arise out of or relate to his "use of the Services." For starters, all of Mellen's claims arise from his February 20, 2016 ride with Defendant Dalton, whom Mellen alleges he "had hailed off UBER's ride-sharing **App**." PageID.18 (emphasis added). Each of Mellen's three claims

22

specifically depends on his allegation that "relying on representations made by Defendants Uber [namely, Uber and Rasier]," he "chose to accept the exchange of his money to engage the trade or commerce in which Defendants Uber offered by way of its **products and/or services**." PageID.25, 29, 31 (emphasis added).

Mellen's claims also all depend on his allegation that he "rel[ied] on representations made by Defendants Uber" that are "specified in paragraph 5" of his Complaint. *Id.* Mellen's MCPA claim (Count I) additionally depends on his allegation that Uber and Rasier violated the MCPA by "violat[ing] the offers, representations, [and] statements referenced in paragraph 5," PageID.28, and Mellen's fraud claims (Counts II and III) additionally depend on his allegation that he "was damaged as a result of his reliance" on the representations alleged in Paragraph 5. Page ID.31, 33. The representations specified in Paragraph 5 of the Complaint were allegedly made by Uber and Rasier "**on its website and/or on its 'App'**." PageID.13 (emphasis added).  Mellen alleges again elsewhere that Uber and Rasier violated the MCPA based on the "clear community standards / code of conduct set forth on their own **website** and as a prerequisite to even using their **'App'**" (PageID.23) and committed fraud through representations that Mellen found on Uber and Rasier's "**webpage / App**" about a "Safe Rides Fee." PageID.29, 32 (emphasis added).

In short, Mellen repeatedly alleges that all three of his claims arise directly from his use of Uber and Rasier's "products," "services," "website," and "App[lication]," all of which are defined in Uber's Terms and Conditions as Uber and Rasier's "Services." Ex. B to Ex.1, §1; Ex. E to Ex. 1, § 3. All three claims therefore fall squarely within the scope of the arbitration agreements.

   2. <u>The arbitration agreement does not expressly exclude Mellen's claims from its broad scope.</u>

The arbitration agreement's broad scope dispels any doubt that Mellen's claims are subject to arbitration. In fact, the scope of the arbitration agreement here is even broader than those in

*Huffman* (covering "any Claim arising out of or relating to this Agreement") and *Nestle Waters* (covering "any controversy arising out of" the parties' contract) because it covers not only "any dispute, claim or controversy arising out of or relating to" Uber's Terms and Conditions, but also "any dispute, claim or controversy arising out of or relating to . . . use of the Services." Ex. B to Ex. 1, § 6; Ex. E to Ex. 1, § 2. And in the face of such a "broad" arbitration agreement, "only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (citation omitted); *Nestle Waters*, 505 F.3d at 503 (affirming that "[i]n the absence of any express provision excluding a particular grievance from arbitration…only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail" (quoting *AT&T Techs.*, 475 U.S. at 650)).

The arbitration agreement here does not exclude Mellen's claims—or any claims at all, for that matter—from arbitration. It does not expressly state that claims for consumer misrepresentation or fraud "shall not be subject to arbitration." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 583 (1960). Because Mellen's claims are not expressly excluded from the "extremely broad" arbitration agreement, they are subject to mandatory arbitration.

3.  <u>The arbitration agreement is valid and Mellen cannot allege or show otherwise.</u>

Mellen has not challenged—and cannot challenge—the arbitration agreement's validity. In any event, courts have repeatedly found that the same arbitration agreement is valid—in particular, that it is not unconscionable.

Under both Michigan and California law, "[i]n order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be

present." *Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138, 143-44; 706 N.W.2d 471 (2005); *see Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 748 (Cal. 2015). "Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term," whereas "[s]ubstantive unconscionability exists where the challenged term is not substantively reasonable." *Clark*, 268 Mich. App. at 144; *cf. Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (2012).

"If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability." *Zawada*, 2016 WL 7439198, at *6-7 (citation omitted); *Pinnacle*, 282 P.3d at 532 (stating that "procedural unconscionability requires oppression or surprise" and that "[o]ppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form"). Here, Mellen does not allege (and cannot show) that he was not free to accept or reject Uber's Terms, that he had no "meaningful choice" other than to sign up for Uber's services, rather than some other service, or that the arbitration agreement was "hidden" within a lengthy printed form. Indeed, Mellen alleges that he "**chose** to accept the exchange of his money to engage the trade or commerce in which Defendants Uber offered by way of its products and/or services." PageID.25 (emphasis added). And Mellen does not allege (and cannot show) that the arbitration provision was "hidden" in Uber's Terms: to the contrary, the 2015 arbitration agreement is prominently indicated by the headings "DISPUTE RESOLUTION" and "ARBITRATION" in capital letters and larger font than the surrounding text, and the 2016 arbitration provision, as explained above, appeared in bold, capitalized print in the first section of the first page of Uber's updated Terms. Ex. B to Ex. 1, § 6; Ex. E to Ex. 1, § 1.

The arbitration agreement is not substantively unconscionable either. Again, Mellen has

not challenged any term of the arbitration agreement as not substantively reasonable. *See Clark*, 268 Mich. App. at 144. Both the 2015 and 2016 arbitration agreements provide that only Mellen can seek injunctive relief, declaratory relief, attorneys' fees, and costs in the arbitration; Uber cannot. Ex. B to Ex. 1, § 6; Ex. E to Ex. 1, § 2. The agreements further provide that the parties will split administrative fees unless the claim is for under $75,000, in which case Uber will pay all the administrative fees. *Id.* Any claim that arbitration would result in prohibitive costs for Mellen is thus speculative and not enough to establish substantive unconscionability. *See Zawada*, 2016 WL 7439198, at *7 (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)).

### III.   The Court must stay this action until arbitration is completed.

Section 3 of the FAA provides that district courts "shall" stay proceedings until the arbitration of any referable issues is completed. 9 U.S.C. § 3; *see Anderson v. Charter Commc'ns, Inc.*, 860 F. App'x 374, 379 (6th Cir. 2021) (noting that the Second, Third, Tenth, and Eleventh Circuits have held that district courts cannot dismiss a case under Section 3 based on the provision's text and structure). The Sixth Circuit has, in unpublished decisions, nonetheless authorized dismissal of actions where all the claims in the case are subject to arbitration. *Ozormoor v. TMobile USA, Inc.,* 354 F. App'x 972, 975 (6th Cir. 2009). As shown above, all of the claims in this case are subject to arbitration. But in a recent unpublished decision, the Sixth Circuit has clarified that where the parties leave "gateway" issues for the arbitrator to decide, then the district court should stay the case rather than dismiss it. *Anderson*, 860 F. App'x at 380 (affirming district court's decision to order arbitration, but finding court abused its discretion by dismissing case and remanding "with instructions to enter a stay pending that arbitration"). Because the parties here left "gateway" issues such as the scope of their arbitration agreement to the arbitrator, the Court should stay the case after compelling arbitration of Mellen's claims.

## CONCLUSION

For these reasons, Uber and Rasier respectfully ask the Court to grant their motion, compel arbitration of Mellen's claims against Uber and Rasier, and stay the case.

Respectfully submitted,

Dated: December 2, 2021

/s/ Matthew P. Allen
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
James L. Woolard (P77493)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
840 W. Long Lake Rd., Ste. 150
Troy, Michigan  48098
(248) 879-2000
cranmer@millercanfield.com
allen@millercanfield.com
woolard@millercanfield.com

*Attorneys for Defendants Uber Technologies,
Inc. and Rasier, LLC*

## CERTIFICATE OF COMPLIANCE

The foregoing *Brief Supporting Uber Technologies, Inc.'s and Rasier, LLC's Motion to Compel Arbitration and Stay Proceedings under 9 U.S.C. §§ 3-4* contains 8,793 words as defined by L. Civ. R. 7.2(b)(1). Microsoft Word was used to generate the word count.

## CERTIFICATE OF SERVICE

I certify that on December 2, 2021 I filed the foregoing *Uber Technologies, Inc.'s and Rasier, LLC's Motion to Compel Arbitration and Stay Proceedings under 9 U.S.C. §§ 3-4* using the Court's ECF system, which will serve all counsel of record.

Dated: December 2, 2021

/s/Michelle M. Lingenfelter

38398522.5/155289.00011